UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE

DEBORAH K. ANNA )
)
V. ) NO. 2:10-CV-190
)
MICHAEL J. ASTRUE, )
Commissioner of Social Security )

REPORT AND RECOMMENDATION

The matter is before the United States Magistrate Judge, under the standing orders of the Court and 28 U.S.C. § 636 for a report and recommendation. Plaintiff's application for Supplemental Security Income under the Social Security Act was denied following two hearings before an Administrative Law Judge ["ALJ"]. Both the plaintiff and the defendant Commissioner have filed dispositive Motions [Docs. 10 and 17].

The sole function of this Court in making this review is to determine whether the findings of the Secretary are supported by substantial evidence in the record. *McCormick v. Secretary of Health & Human Services*, 861 F.2d 998, 1001 (6th Cir. 1988). "Substantial evidence" is defined as evidence that a reasonable mind might accept as adequate to support the challenged conclusion. *Richardson v. Perales*, 402 U.S. 389 (1971). It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the jury. *Consolo v. Federal Maritime Comm.*, 383 U.S. 607 (1966). The Court may not try the case *de novo* nor resolve conflicts in the evidence, nor decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if the reviewing court were to resolve the factual issues differently, the Secretary's decision must stand if supported by substantial evidence. *Listenbee v. Secretary of Health and Human*

*Services*, 846 F.2d 345, 349 (6th Cir. 1988). Yet, even if supported by substantial evidence, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2007).

Plaintiff was 40 years old when her application was filed in 2007. She has no past relevant work experience. She has a high school education. The ALJ found that she has severe impairments of degenerative disc disease and obesity. The plaintiff alleged other severe impairments, including a mental impairment. However, the ALJ found that her mental impairment was not severe.[1]

Plaintiff's medical history is summarized in the Commissioner's brief as follows:

> In December 1997, a psychiatrist prescribed psychiatric medication for Anna, noting that she had depression and had been on anti-depressants in the past (Tr. 689). A few months later, the psychiatrist told Anna that he would no longer prescribe medications unless she entered psychotherapy (Tr. 688). He also refused to renew a prescription for Klonopin "because [Anna] ha[d] to[o] many dependency needs as it is" (Tr. 687).
> In August 1998, a psychiatrist noted that Anna was not keeping her therapy appointments (Tr. 685-86). Yet, Anna again requested Klonopin, claiming insomnia, anxiety, crying spells, poor concentration, inability to focus, lack of motivation, and a depressed mood (Tr. 685). However, the psychiatrist refused and noted that Anna's mental status exam was normal (Tr. 685).
> After a eleven month break (in which she missed three appointments) Anna returned to her psychiatrist (680-84). Anna said that during that period she was treated by her primary care physician and that she "d[id] pretty well" as long as she took her medications (Tr. 680). She had a depressed mood and restricted affect, but her mental status exam was otherwise normal (Tr. 680).
> Two months later, Anna complained of anxiety and paranoia (Tr. 678). A psychiatrist was "very uncomfortable" about prescribing Klonopin because of its

---

[1]Plaintiff's assignments of error relate solely to the ALJ's finding that she did not have a severe mental impairment. No argument was raised regarding his findings regarding her physical limitations and the same is therefore waived.

2

addictive nature, but did so on a one-time basis (Tr. 678). Six days later, Anna was admitted to a psychiatric hospital and was then discharged with more Klonopin and another medication (Tr. 677). Three weeks after her hospitalization, Anna had a normal mental status exam (Tr. 677).

In November 2000, Anna was admitted to a hospital after finding out that her husband had been cheating on her (Tr. 322, 325). Anna was diagnosed as having major depression and panic disorder (Tr. 322-23). At the hospital, Anna received medication and "made good progress" with improved mood, awareness, and insight (Tr. 322). While she arrived at the hospital with Global Assessment of Functioning ("GAF") score of 35, indicating "[s]ome impairment in reality testing or communication . . . . OR major impairment in several areas," she was discharged with a GAF score of 60, indicating "[m]oderate symptoms" (Tr. 323).

Anna had mostly normal mental status exams in 2001 and 2002, except for occasionally having a "down" mood or affect, especially when dealing with the stress of caring for her father after his stroke (Tr. 654-69). Anna continued to have mostly normal mental status exams between 2003 and 2005, except for being anxious (Tr. 332-56). In 2004, a social worker was told that Anna was selling her food stamps to buy drugs, but Anna denied that report (Tr. 344).

Anna is documented to have missed a number of therapy and medication check appointments in this time period (Tr. 338, 349, 352, 354, 663-64). She also missed or cancelled her sleep test three times in 2003 and 2004, claimed that she either had a "conflicting appointment" or was too ill to attend (Tr. 342, 349, 351). Anna then had an initial sleep study in May 2005 (Tr. 337). Although the physician who performed the sleep study, and Anna's mental health treaters urged her to have a follow-up sleep study (Tr. 336, 406), there is no record of Anna doing so.

In 2006, Anna had normal mental exams, except for once having an agitated mood (Tr. 875-77). In June 2006, Anna complained that none of her medications were working, but then admitted "on further inquiry" that she had not been taking her medications for at least three months (Tr. 331). Also, Anna reported that during 2006 she was convicted of a felony and spent seven days in jail (Tr. 981).

In August 2006, Dr. Horace E. Edwards reviewed Anna's medical records for the state agency and opined that Anna had moderate difficulties maintaining concentration, persistence, pace, and social functioning, but mild restrictions in activities in daily living (Tr. 499). He also thought that Anna could not interact with the general public, but could understand and remember simple and low-level tasks (Tr. 513). With some difficulty, Dr. Edwards believed that Anna could adapt to changes and maintain attention, concentration, persistence, and pace (Tr. 513).

In 2007, Anna had normal mental status exams, except for some mild agitation (Tr. 870-75). Anna also missed three therapy sessions in 2007 (Tr. 884-85).

Also in 2007, Anna saw pain specialist Dr. Timothy Smyth, who recommended physical therapy, but no narcotic pain medications (Tr. 918). Once Anna realized she was not going to receive a prescription for Lortab (a narcotic pain medication), she complained that she "waste[d] her time by coming" to Dr. Smyth

3

and refused to go to physical therapy unless she was given narcotic pain medications (Tr. 918).

Anna continued to miss therapy sessions in 2008, not showing up to a total of six appointments (Tr. 883-84). Despite these missed appointments, most of Anna's mental status exams were normal (Tr. 868-871, 929-31), with nurse Lyn Govette noting in January 2008, that Anna was coping well with the stress of caring for her children (Tr. 870). In fact, in March 2008, Ms. Govette noted that there was no psychological problem that would prevent gastric bypass surgery (Tr. 869-70). That same month, Anna told the agency that she showered rarely, wore a gown, no longer went to church or Walmart, and very rarely went outside (Tr. 246-47, 249). But in the same report, Anna also wrote that she shopped for groceries once a month for two hours (Tr. 249). In addition, she cared for her son and her dog, cooked meals daily, and washed dishes (Tr. 247-48). Four months later, in September 2008, Anna reported good responses from her medications (Tr. 931).

Also during 2008, Drs. Frank D. Kupsta and Rebecca Joslin reviewed Anna's medical records for the state agency (Tr. 690-706, 895-911). Both opined that Anna had moderate difficulties maintaining concentration, persistence, pace, and social functioning and mild restrictions in activities of daily living (Tr. 700, 905). Dr. Kupstas also opined that Anna was able (with some difficulty) to interact with the general public and sustain concentration, persistence, and pace (Tr. 706). However, Dr. Kupstas did not believe that Anna had difficulty with sustaining concentration, persistence, and pace for simple tasks, or that Anna had difficulty with understanding, memory, or adaptive skills (Tr. 704-06). Dr. Joslin opined that Anna could not interact appropriately with the general public, but could (with some difficulty) adapt to changes and maintain concentration, persistence, and pace (Tr. 911). Dr. Joslin also believed that Anna could understand and remember detailed instructions (Tr. 911).

Anna had mostly normal mental status exams in 2009 (although she was occasionally unkept and/or anxious) (Tr. 927-28, 934-38, 969, 992, 997), except that she twice had a depressed mood and affect (Tr. 994, 996). Ms. Govette and case manager Angela Williams both noted that Anna was missing therapy appointments (Tr. 928, 994). In addition, in April 2009, Anna admitted to Ms. Williams that she was only "mostly" compliant with her medications (Tr. 938-39). Anna later reported that she was totally compliant with her medications (Tr. 994) and that she had gone off of Lortab for two weeks (Tr. 996). But she also admitted taking more Xanax than prescribed (Tr. 993, 996), and the she was unable to wean herself off of benzodiazepine (Tr. 927).

Despite noting normal mental status exam three weeks earlier (Tr. 927), in June 2009, Ms. Govette rated Anna's abilities as "fair," "poor," or "none" in sixteen areas of occupational, performance, and personal-social adjustments (Tr. 925-26). Ms. Govette, however, left blank the areas of the form that requested the findings that supported her ratings (Tr. 925-26).

Also, at Anna's first hearing, Ms. Williams said that Anna liked to isolate

4

herself and had depression, anxiety, racing thoughts, and difficulty concentrating (Tr. 55). She testified that Anna had been compliant "ever since [she] had been on the case" (Tr. 55), and was unaware of other times that Anna was not compliant (Tr. 56).

Two weeks later, Kathy Birchfield, M.Ed., examined and tested Anna for the state agency (Tr. 980-90). Anna told Ms. Birchfield that she talked to a friend every morning, kept a shopping list, and usually went shopping in the very early morning (when there were less people around) (Tr. 982).

Testing indicated a "likelihood that she [was] exaggerating the severity of her impairment" and that she was "willing to endorse common symptoms at such a high degree of specificity that it renders to suspect the symptom presentation" (Tr. 985). Ms. Birchfield also noted that although Anna had a blunt affect, her mental status exam was otherwise normal (Tr. 382). Yet, she opined that Anna had a significant amount of mood disorders, assigned Anna a GAF of 50, the upper range of indicating "[s]erious symptoms" (Tr. 985). DSM IV at 34. But she assessed Anna as being only mildly restricted in her abilities to understand, remember, and carry out instructions, as well as only moderately restricted in her ability to interact with others and respond appropriately to changes in a work setting (Tr. 987-88).

The ALJ held Anna's second hearing in December 2009 (Tr. 25-40). At that hearing, a consultative physician and a consultative psychologist testified after reviewing Anna's records (Tr. 27-38). Dr. Susan Bland opined that Anna engaged in drug seeking behavior that made it difficult to evaluate her physical problems (Tr. 31).

Dr. Thomas E. Schacht concluded that the existence of psychological limitations "boils down to a credibility determination for the [ALJ]" (Tr. 36). He noted that Anna had "lots of noncompliance with medication" and misused controlled substances since the beginning of her treatment (Tr. 33). Dr. Schacht testified that Anna was "willing to say things to [her treaters] that simply d[id]n't make sense to get controlled substances" (Tr. 33). He also noted that Anna claimed that she missed her sleep study due to a conflicting appointment, which was difficult to understand because sleep studies take place at night (Tr. 33). Similarly, Anna complained to her mental health nurse that none of her medications were working, but then admitted to not taking her medications for three months (Tr. 34).

Dr. Schacht further pointed out that when Anna realized that she was not going to get Lortab, Anna accused her physician of wasting her time and refused to participate in therapy unless she was given narcotic medications (Tr. 34). He also noted that Anna's psychological nurse approved gastric bypass surgery – surgery that is typically only done if a patient has been given psychological clearance (Tr. 34).

Dr. Schacht also testified that the pharmacy records that Anna disclosed to the Commissioner did not have records of all of Anna's narcotic prescriptions (Tr. 34-35). That meant that either Anna did not fill those prescriptions or that Anna used pharmacies that she did not disclose to the Commissioner (Tr. 35).

Dr. Schacht noted that Anna claimed extreme symptoms to Ms. Birchfield, but her "[p]erformance on all tests sensitive to psychopathology was invalid" and

5

were above the threshold for malingering (Tr. 35). Dr. Schacht also opined that there was no significance to the GAF score given by Ms. Birchfield, because Ms. Birchfield did not spell out the reasons for that score (Tr. 36). Furthermore, that GAF score seemed to be based upon Anna's subjective reports (Tr. 36).

[Doc. 18, pgs. 2-9].

As previously stated, in his hearing decision, and thus in his question asked of the vocational expert at the administrative hearing, the ALJ found that the plaintiff did not have a severe mental impairment. He found that she retained the residual functional capacity, due to her physical impairments, to perform light work which involved occasional postural activities but would not require climbing of ladders, working at unprotected heights, or around hazardous equipment or machinery. (Tr. 13).[2]

Donna Bardsley, the vocational expert, when asked if there were jobs within this RFC which the plaintiff could perform identified the jobs of hand packagers, sorters, assemblers, inspectors, ticket sellers, sales clerks, cashiers, hostesses and greeters. She stated that there were 12,000 such jobs in the region and 8.5 million in the nation. (Tr. 39). When asked by plaintiff's counsel to add to the ALJ's hypothetical "the additional assumption that an individual had a moderately limited ability to maintain attention and concentration for extended periods, to complete a normal work day and work week without interruptions from psychologically based symptoms, to accept instructions and respond appropriately to criticism from supervisors, get along with coworkers and to respond appropriately to changes in the work setting and also a markedly limited ability to . . . interact appropriately with the

---

[2]This RFC was based upon the opinion of Dr. Susan Bland, a medical expert who testified at the second hearing. (Tr. 31).

6

general public," Ms. Bardsley stated that "there would not be any jobs based on a combination of those." (Tr. 40).

Based upon Ms. Bardsley's identification of jobs in response to his own hypothetical, the ALJ found that the plaintiff was not disabled. (Tr. 18).

Plaintiff asserts that the hypothetical ton the VE was defective for two reasons. First, it contained no psychological limitations. Second, there was no evidence from which the ALJ could have concluded that the plaintiff had no psychological limitations.

Obviously, it would not be erroneous for the ALJ to exclude psychological limitations from his RFC and his question to the VE *if* there was substantial evidence to support his finding that she had no severe mental impairment. Plaintiff's second point is the one upon which the plaintiff's position rises or falls.

There are mental assessments in the record from four sources. First, on March 31, 2008, Dr. Frank Kupstas, a non-examining state agency psychologist, submitted an assessment based upon his review of the plaintiff's mental health records. He found that the plaintiff was "moderately limited" in her ability to maintain attention and concentration for extended periods and the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. He also found the plaintiff to be "moderately limited" in the ability to complete a normal workday and workweeks without interruptions from a psychological impairment and to perform at a consistent pace, and in her ability to interact appropriately with the general public. In his "functional capacity assessment" he stated that plaintiff was "able to sustain [concentration, persistence and pace] over extended periods for simple tasks, detailed with some difficulty at times but still can do

7

so." He also stated she could "interact with general public with some difficulty at times, but still can do so." (Tr. 704-06).

The next assessment is from Dr. Rebecca Joslin, another non-examining state agency psychologist, dated October 20, 2008. She opined that the plaintiff had a "moderately limited" ability to maintain attention and concentration for extended periods; to complete a normal workday and workweek; to accept instructions and criticism from superiors; to get along with coworkers; and to respond appropriately to changes in the work setting. She found that the plaintiff was "markedly limited" in her ability to interact appropriately with the general public. In her "functional capacity assessment," Dr. Joslin stated the plaintiff could "understand and remember simple and detailed [instructions], was "able with some difficulty to maintain attention, concentration, persisntence and pace, was "unable to interact appropriately with gen public," and "able, with some difficulty to adapt to changes." (Tr. 909-11).

The third assessment is from Lyn Govette, a therapist at Charlotte Taylor Center, dated June 22, 2009 and Linda Gentles. They opined that the plaintiff had a "fair" ability to follow work rules, relate to coworkers, function independently, to maintain concentration and persistence, to understand simple job instructions, to behave in an emotionally stable manner, to relate predictably in social situations, and to demonstrate reliability. The form defined "fair" as "ability to function in this area is seriously limited, but not precluded." Ms. Govette opined that the plaintiff had no useful ability to deal with the public, use judgment with the public, deal with work stresses, understand complex or detailed job instructions, or to maintain person appearance. (Tr. 925-26).

8

The final assessment was conducted between the first and second hearing by Ms. Kathy Birchfield, M.Ed., who examined and tested the plaintiff at the request of the Commissioner. After interviewing and testing the plaintiff, Ms. Birchfield opined that the plaintiff had only mild impairments regarding understanding and carrying out job instructions of all levels of difficulty and in making judgments. "Mild" is defined as meaning that "there is a slight limitation in this area, but the individual can generally function well." Ms. Birchfield found that the plaintiff's ability to interact appropriately with the public,, supervisors and coworkers, and to respond appropriately to usual work situations and changes in routine was "moderate." "Moderate" is defined as meaning that There is more than a slight limitation in this area but the individual is still able to function satisfactorily." Ms. Birchfield stated "Ms. Anna has no intellectual or achievement limitations. Her mental health issues are likely to have a negative impact on her ability to relate to others and think clearly." Also, she stated "her mood problems cause her to have a lower threshold for frustrating or time consuming issues." (Tr. 987-88).

Dr. Schacht did not offer an assessment as such, but recounted the evidence from the record and pointed out indicators regarding the plaintiff's veracity. In particular, he pointed out incredible statements made to obtain both narcotic prescription medication and strong anti-depressants.

With regard to Drs. Joslin and Kupstas, the state agency psychologists, the ALJ concurred "with the opinion of the State Agency consultant who determined the claimant was able to understand and remember simple and detailed instructions. However, the undersigned rejects the opinion that the claimant is able with some difficulty to maintain

9

attention, concentration , persistence and pace, and adapt to changes; and is unable to interact appropriately with the general public..." because "that opinion is inconsistent with the record as a whole, and the undersigned finds mild limitations in these areas and the limitations do not preclude the performance of light work." (Tr. 16).

With respect to the opinion of Ms. Govette and Ms. Gentles, "the undersigned assigns no weight to [their opinion] as they are not considered acceptable medical sources..." and because "this opinion is not consistent with the objective medical evidence of record...." (Tr. 16).

Finally, with regards to Ms. Birchfield's opinion, which the ALJ himself ordered be obtained, he stated "the undersigned rejects the opinion of Ms. Birchfield who determined the claimant had moderate limitations in her ability to interact with supervisors, coworkers, and the public, as well as respond to changes in a routine work setting. Ms. Birchfield's assessment is too restrictive and is not supported by the diagnostic testing which revealed that the claimant was exaggerating her symptoms and malingering." (Tr. 16).

Assuming that the ALJ correctly rejected all of the mental assessments, the question seems to this Court to be, where is the opinion of a mental health professional upon which the ALJ relied for substantial evidence that the plaintiff had no severe mental impairment? All were found wanting, and rejected for one reason or another. Something must fill this void.

No one, not even either of the state agency psychologists, opined that the plaintiff did not have at least some moderate limitations. Therefore, although it is left unsaid, the ALJ himself supplied the psychological opinion, concentrating on his finding that the plaintiff was

10

not credible. He was totally within his rights as the finder of fact in not believing the plaintiff. It is quite another matter, however, to disbelieve *all* of the mental assessments *and* not have at least *one* mental assessment to support his finding that the plaintiff does not have a severe mental impairment.

In fairness, the ALJ has probably seen more individuals claiming to be disabled by mental impairments than most of the mental health professionals who provide assessments. His intuition that the plaintiff does not have a severe mental impairment may, in fact, be literally true. However, his intuition alone is not enough. He can make findings of fact as to which assessments are credible and which are not, but cannot simply opine himself that the plaintiff's mental impairment is not severe.

The *de minimis* standard for a finding of a severe impairment requires the Commissioner to tread carefully, and where as here, a person has a long record of mental health treatment, and has convinced every psychologist and therapist who offered an opinion, most of whom examined her for the Commissioner, it is simply going too far to say they are all wrong. If there was a mental assessment supporting the ALJ's finding, the situation could well be different.

The plaintiff asserts that this Court should award benefits. As previously stated, the ALJ had significant grounds to disbelieve the plaintiff regarding her subjective complaints. Also, it is certainly not a foregone conclusion that the VE would identify no jobs if the plaintiff had only moderate limitations, as opined by Ms. Birchfield and Dr. Kupstas, which means a person can "function satisfactorily" in the workplace.

In fact, under the facts of this case, the Court finds that the Commissioner's position

11

was substantially justified, even though the ultimate decision on RFC was not sufficiently supported by substantial evidence. There is nothing to indicate that the ALJ was out to cobble together a denial of benefits, or that he flagrantly disregarded applicable law to that end.

It is respectfully recommended that the plaintiff's Motion for Judgment on the Pleadings [Doc. 10] be GRANTED for a remand for further evaluation of the plaintiff's mental impairment and another hearing with a vocational expert. It is further recommended that the Commissioner's Motion for Summary Judgment [Doc. 17] be DENIED.[3]

Respectfully submitted:

  s/ Dennis H. Inman
United States Magistrate Judge

---

[3]Any objections to this report and recommendation must be filed within fourteen (l4) days of its service or further appeal will be waived. 28 U.S.C. 636(b)(1).